IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 5, 2020

**STATE OF TENNESSEE v. CHARLIE EVANS**

**Appeal from the Criminal Court for Shelby County**
**No. 16-06090     W. Mark Ward, Judge**

---

**No. W2019-01571-CCA-R3-CD**

---

The Defendant, Charlie Evans, was convicted after a jury trial of especially aggravated kidnapping, a Class A felony. See Tenn. Code Ann. § 39-13-305. In this appeal as of right, the Defendant contends that the evidence was insufficient to prove that he caused serious bodily injury to the victim. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Phyllis Aluko, District Public Defender, Harry Eugene Sayle, III (on appeal); and Hillary Lynn Weiss and Robert C. Felkner (at trial), Assistant Public Defenders, for the appellant, Charlie Evans.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Holly Brewer Palmer, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**

This case arises from the Defendant's kidnapping of his girlfriend, Dorothy Leseueur, on May 29th through 30th of 2016. The Defendant and victim had been dating for two years prior to the kidnapping. The September 2016 term of the Shelby County Grand Jury charged the Defendant with especially aggravated kidnapping and aggravated

assault. See Tenn. Code Ann. §§ 39-13-102, 39-13-305. The Defendant's trial was held on June 18 and 19, 2019.

At the trial, Germantown Police Department ("GPD") Officer John Paul Fleming testified that on May 30, 2016, he received a general dispatch call about domestic violence in progress occurring in a white vehicle. The vehicle was reportedly in the area of Poplar Avenue and Officer Fleming was traveling west on Poplar Avenue, when he saw a white vehicle parked in the driveway of Our Lady of Perpetual Help, a Catholic church. He took note of the white vehicle because usually "[no] cars [were] parked there during that time of day[.]"

Officer Fleming pulled into the church driveway behind the white vehicle and activated his lights. The Defendant stepped out of the car and approached him. The Defendant stated that his vehicle had run out of gas and he was waiting for a family member to bring him gas. While speaking to the Defendant, two more officers arrived at the scene. Officer Fleming asked another officer to speak with the Defendant while Officer Fleming walked to the vehicle to check for other occupants.

Officer Fleming testified that he found a "black female that had extremely swollen eyes, swollen face, and caked on blood" in the passenger-side front seat. He stated that the victim was reclined in the seat and that her eyes were "completely swollen shut" and "about the size of baseballs." He asked the victim what had happened, but "her lips were swollen" and she "kind of mumbled." Her speech was unclear but could still be understood. Officer Fleming called one of the other officers over to observe the victim's condition and then called for Germantown paramedics. The Defendant was arrested. Officer Fleming and the two other police officers determined from speaking to the victim that no crime had been committed in Germantown; as a result of the victim's statement, however, the Memphis Police Department ("MPD") was called.

Officer Fleming testified that after the paramedics placed the victim in a neck brace and cleaned some of the dried blood from her face, he took photographs of the victim. Officer Fleming noted that the photographs did not accurately depict the victim's condition when he initially encountered her and that she "looked a lot worse" before the paramedics began treating her.

GPD Officer Hugh Matthew Hatley testified that he recalled receiving the same domestic violence dispatch call on May 30, 2016. After receiving the call, Officer Hatley was driving in the vicinity of Our Lady of Perpetual Help church when he saw Officer Fleming and his patrol car. Officer Hatley entered the church parking lot, exited his car, and approached Officer Fleming who was speaking with the Defendant. Officer Fleming

-2-

instructed Officer Hatley to continue speaking with the Defendant while he went to check the car for passengers.

The Defendant told Officer Hatley that he and the victim "had run out of gas" and that they were on the way back to Holly Springs, Mississippi from a family reunion. The Defendant continued that he and the victim had gone to Beale Street after the reunion and "a random person came up and hit [the victim.]"

After speaking with the Defendant, Officer Hatley approached the white vehicle and saw the victim, who "was sweating quite a bit, had blood on her face, and her face was extremely swollen." He testified that "it was obvious [] that [the victim] had been beaten." Based upon his eleven years of police experience, Officer Hatley asserted that the victim looked as if "she had been punched a significant amount of times" and that the victim's injuries did not seem consistent with the Defendant's story.

After observing the victim, Officer Hatley handcuffed the Defendant and placed him in the back of his patrol car. After speaking with the Defendant further, both officers discovered that the relevant events took place in Memphis and the MPD was called. Upon arriving, MPD took custody of the Defendant.

MPD Officer Walter Jordan testified that on May 30, 2016, he responded to a call at Our Lady of Perpetual Help church. Upon arrival, Office Jordan stated that he found Germantown Police Officers interacting with the "people who had an incident." He had been called because the "incident occurred in the city limits of Memphis." Based upon his discussions with the Germantown Police officers, Officer Jordan detained the Defendant. The Defendant informed Officer Jordan that the incident took place at a hotel, but Officer Jordan could not recall the name of the hotel.

MPD Sergeant Michael Coburn testified that in May and June 2016, he worked in the crime scene division where he processed cars and collected evidence. Sergeant Coburn received a white Toyota Corolla car labeled with the victim's name and processed clothing and blood from the car. He photographed a shirt, two purses, pillowcases, towels, and a rag, all with traces of blood.

The victim testified that she dated the Defendant "[f]or about two or three years." On May 29, 2016, the victim and the Defendant went to Beale Street to meet the Defendant's brother, his wife, and their two children. Neither the victim nor the Defendant had met the Defendant's brother prior to this day. The group talked at the Hard Rock Café for around two hours. From the restaurant, the group traveled to the Defendant's aunt's home for a family barbecue. After reaching the barbecue around 5 p.m., the Defendant left

in the victim's car once with permission "to get some ice or something" and a second time without the victim's permission.

The victim and the Defendant left the barbecue around midnight. The Defendant was driving the victim's car. The Defendant drove "to a secluded area . . . like a little dead end place, and [the Defendant] parked the car." The victim thought the Defendant was taking her home. After parking the car, the Defendant began to argue with the victim, "saying [the victim] was trying to date [the Defendant's] brother[.]" The victim looked off out of the passenger-side window after denying this statement, and the Defendant "gave [her] a blow upside the head real hard." The Defendant then began attacking the victim by "hitting on [her], beating on [her] with his fist." The Defendant hit the victim's face multiple times.

The victim tried to fight back at first, but then "[the Defendant] popped [her] real hard. . . and [] put a gash" on the victim's head. The victim became lightheaded and started bleeding; she believed that she lost consciousness during the attack.

The victim testified that she "constantly" asked the Defendant to take her home during the attack. The Defendant replied that the victim was "going to die" that night and threatened her with death multiple times.

After the initial attack, the Defendant began driving. The victim attempted to flee when the Defendant stopped the car on a side of the street. During this attempt, the Defendant began biting the victim on the arm and "hitting [the victim] in the side with something." He then pushed her back into the passenger seat and began hitting her in the face. The Defendant stated that he had a weapon, but the victim did not see one. The victim "kept blacking in and out" and she continued to bleed. She asked again to be taken home, but the Defendant refused.

The Defendant then drove to a gas station, where he attempted to purchase gasoline with the victim's debit card. However, the victim had given the Defendant an incorrect "pin number," and the Defendant drove the victim to a hotel instead.

At the hotel, the Defendant resumed accusing the victim of "was trying to date his brother" and began calling the victim "all types of names. . . h-e, s--t, b---h[.]" The victim asserted that the Defendant would wait for her "to look off" and then he would "start popping [her] in [the] face and pushing [her] down and beating on [her] again." The Defendant had taken the victim's cell phone and placed it in his pocket.

The victim thought the Defendant used one of her credit cards to pay for the hotel room, but she did not go with him to the counter to pay. The victim testified that she could

-4-

not escape at the hotel because she was scared, tired, and weak. By the time the Defendant took the victim to the hotel, she believed that she had passed out "probably about four" times. In the hotel room, the Defendant pointed out a photograph that was taken on Beale Street hours earlier. In the photograph, the victim was standing behind the Defendant's brother and nephew.

While in the hotel room, the Defendant continued to hit the victim with his fists. The victim heard the "door[] open" and assumed the Defendant "went out for something." During this time, the victim tried to use the hotel phone, but there was no dial tone. The victim had to use her hands to feel around the hotel nightstand because her "eyesight was blurry" and she was bleeding from a gash on her head.

At some point, the Defendant picked the victim up "off the floor" and told her to "get in the shower and clean up some of [the] blood[.]" The victim was on the floor because she had passed out. She awoke to the Defendant's kicking her. The Defendant had to help the victim shower because her "body was real weak." The victim passed out and awoke the next morning when the Defendant told her that they "were fixing to get ready to go." The Defendant had to help the victim to her car because she was too weak to walk.

The Defendant and the victim left the hotel, and the Defendant drove around until the victim's car was about to run out of gas. During this time, the victim convinced the Defendant to take her to her place of employment in Collierville "to put in some kind of medical leave paper." The victim told the Defendant that he could drive down Poplar Avenue to reach her place of employment. At this time, the Defendant repeatedly apologized for "what he had done."

The car ran out of gas at "a church." The Defendant exited the car to see if anyone was "inside the church" and also called his mother and asked her to bring gas. The victim's children repeatedly called her cell phone, and she convinced the Defendant to let her use her phone to return the calls to "assure them that [she was] okay." After the Defendant handed the victim her phone, she convinced the Defendant to leave the car and stand by the road so that his mother could find them more easily. After the Defendant exited the car, the victim called 9-1-1. She was unable to tell the operator where she was, but she turned on the location services function on her cell phone and relayed to the operator the Defendant's mentioning a Catholic church. The victim hung up the phone when the Defendant came back to the car. The operator subsequently called the victim back and asked the victim to "pretend [she] was talking to [her] daughter[.]" The police were eventually able to locate the car and the victim told them "that [the Defendant] had kidnapped [her] and was just trying to kill [her] for no reason." The victim denied being in a fight on Beale Street on May 29, 2016, and she affirmed that the Defendant caused her injuries.

The victim identified photographs of her car, the hotel bedsheets and a pillowcase, her purse and her clothing from that day. She noted that the Defendant had taken the bedsheets with them because "they were full of blood."

The victim could not recall if police officers took photographs of her before she was placed in the ambulance. She was taken to the hospital, where she remained for one day. The victim had suffered a broken nose and a broken eye socket that required surgery, and a neck sprain. She testified that she suffered a neck sprain "from [the Defendant] choking [her] and chopping [her] on [the] neck with his hand."

The victim testified that she gave the police a statement of the incident "probably a week" after she was taken to the hospital. After reviewing her statement in court, she agreed that she had signed her statement sixteen days after the incident. She also agreed that she had her photograph taken on the same day. She was still wearing her neck brace and her eye socket was still swollen from the surgery.

The victim testified that after the Defendant was arrested, he attempted to communicate with her by letters mailed to her home. The victim read one such letter but did not read the others until just before trial; she gave all of the letters to the police. The victim identified the Defendant's handwriting and name in three such letters. In the letters, the Defendant asked for the victim's forgiveness and that she not testify in his trial.

On cross-examination, the victim agreed that her relationship with the Defendant was fairly good prior to May 29, 2016. On the day of the incident, she agreed to accompany the Defendant to meet his brother because the Defendant "wanted [her] to go with him." The victim agreed that she and the Defendant had a good time with the Defendant's brother and his family. The victim denied drinking alcohol and she could not recall if anyone else was drinking alcohol at the restaurant.

The victim asserted that after the Defendant picked her up from the barbecue, he yelled at her about "trying to go with his brother[.]" She denied yelling back at the Defendant. She maintained that the Defendant had been drinking prior to midnight.

When questioned about the gas station stop, the victim agreed that the Defendant was inside for some time. She said, though, that she was weak, bleeding, and had been hit many times. She said that she tried to get the attention of a man at the gas station, but the man did not see her. The victim noted that she could not drive away because the Defendant had taken the car keys.

The victim acknowledged that she did not try to sound the car's horn or get out when the Defendant parked at the hotel. The Defendant "helped [the victim] inside the hotel" because she was too weak to stand on her own. She did not yell for help because "when [she] did that before [the Defendant] started hitting [her] a little harder," referencing when the Defendant bit her arm.

The victim stated that the Defendant helped her shower at the hotel. She could not properly wash her face because it was too sore. She did not dress after the shower and the Defendant had to help her back to the bed.

The victim testified that after attempting unsuccessfully to use the hotel telephone, she stopped trying to make a call when the Defendant returned. The Defendant then began to "pac[e] the floor saying the same thing over and over again" and threatening to kill the victim and "throw [her] body in the river." She maintained that she would not have been able to run away from the hotel due to her weakened state.

Germantown paramedic Westley Jones testified that on May 30, 2016, he responded to a call on Poplar Avenue and treated the victim, whom he recognized had sustained "significant facial trauma." He testified that he had "never seen somebody this beat up" and that he could not immediately determine whether the victim was alive.

During the examination, the victim told Mr. Jones that the Defendant began to beat her around midnight the previous night and that he kept hitting her periodically all night. She reported losing consciousness at least twice during the incident. Mr. Jones could not assess if the victim had suffered a brain injury because he could not see her pupils.

Mr. Jones checked the victim's vital signs, and he noted that the victim's breathing was labored. Mr. Jones stated that he was concerned about the victim's ability to maintain her own airway because of the amount of facial trauma and swelling present. Mr. Jones stated that the victim's forehead, cheekbones, jaw and eyes were swollen to such a degree that he could not assess her eyes or mouth, and had to ask the victim to use her tongue to determine whether any of her teeth were broken. Mr. Jones found a "very large" hematoma on the back of the victim's head, which he opined was the result of being struck with a blunt object. The victim's cheekbones and jaw bones were unstable, and she had broken facial bones. He testified that the bruising on the victim's face reflected different "stages," which indicated that the injuries were inflicted between four and twelve hours before his examination.

Mr. Jones testified that the victim was alert and competent, although she was "in extreme pain" and made "some noises" during the exam. He also noted a human bite mark on the victim's arm and that she had some broken ribs further hindering her breathing. Mr.

Jones stated that due to the type of injuries he observed, he was concerned that the victim could have a neck fracture. After assessing the victim's neck and spine, he was able to move her to the ambulance. He decided to transport the victim to a level one trauma center based on the severity of her injuries.

Mr. Jones testified that when the victim reached the level one trauma center, her injuries were substantial enough that "shock trauma" was activated. Mr. Jones explained that this "usually only happens when an injury occurs within the last hour." Mr. Jones testified that he was authorized to administer pain medication under certain circumstances and that he gave such medication to the victim because of the amount of pain she suffered.

On cross-examination, Mr. Jones testified that he did not follow-up with the victim after he transferred care. He acknowledged that he did not have an x-ray machine when he examined the victim; he explained that the State provided him with information regarding the victim's subsequent facial surgeries.

Upon this evidence, the Defendant was convicted of especially aggravated kidnapping. A sentencing hearing followed.

The trial court sentenced the Defendant to fifty-eight years to be served at one-hundred percent and he timely appealed.

## ANALYSIS

On appeal, the Defendant contends that the evidence was insufficient to sustain his conviction, arguing that the State did not prove that the victim suffered serious bodily injury. The State responds that the evidence is sufficient.

When examining the sufficiency of the evidence, we must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the

evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Especially aggravated kidnapping is false imprisonment where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-305(a)(4). False imprisonment is knowingly removing or confining another unlawfully so as to interfere substantially with another's liberty. Tenn. Code Ann. § 39-13-302(a). Serious bodily injury means bodily injury that involves: a substantial risk of death, protracted unconsciousness, extreme physical pain, or protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty. See Tenn. Code Ann. § 39-11-106(a)(36). "The distinction between "bodily injury" and "serious bodily injury" is generally a question of fact for the jury and not one of law." State v. Barnes, 954 S.W.2d 760, 765 (Tenn. Crim. App. 1997).

Viewing the evidence in the light most favorable to the State, we conclude that the evidence is sufficient for a reasonable juror to have found beyond a reasonable doubt that the victim sustained serious bodily injury. The record reflects that the Defendant repeatedly struck the victim between midnight and sometime the next morning, resulting in her losing consciousness multiple times. The victim testified that at the gas station and the hotel, she had the opportunity to escape but was too physically weak to flee. She furthered testified that the Defendant had to support her while walking and that she could not shower or walk from the shower to the hotel bed unassisted. Likewise, her eyes were so swollen from the beating that she could not see the hotel telephone and had to feel around for the cord. The victim suffered a laceration on her head that bled, a hematoma to the back of the head, extremely swollen facial features that prevented paramedics from examining the victim's eyes and mouth, a broken nose and eye socket that required surgery, and a neck sprain.

Additionally, Mr. Jones testified that he immediately recognized the victim's condition as indicating "significant facial trauma," and her injuries were so serious that he could not determine whether she was alive. Mr. Jones noted the victim displayed unstable cheekbones and jaw, as well as broken ribs, and a bite mark on her arm. During Mr. Jones's examination, the victim was "in extreme pain," and he decided to have her transported to a level one trauma center based upon the severity of her injuries. Mr. Jones also administered pain medication to the victim en route to the hospital.

The Defendant relies on State v. Farmer, where the Tennessee Supreme Court held that the pain resulting from a through and through bullet wound to the leg was not sufficient to support a finding of serious bodily injury. 380 S.W.3d 96, 99-103 (Tenn. 2012). The victim in Farmer was treated and released from the hospital with a prescription for pain medication, and while the victim testified that he was in pain, he did not testify as to the degree of pain he experienced. Id. at 101. Moreover, the hospital records classified his pain level as mild to moderate, not extreme. Id. While recognizing the difficulty inherent in measuring physical pain, a panel of this court has held that "the enumerated portions of the definition of serious bodily injury should be read as coming from the same class of injuries." State v. Sims, 909 S.W.2d 46, 49 (Tenn. Crim. App. 1995). Accordingly, the critical question is was the pain suffered by the victim in the case extreme enough to be included in the class of injury set out in the definition of serious bodily injury; here, we conclude that it was.

In addition, this court, since Farmer, has previously concluded that serious bodily injury was sufficiently proven in a similar factual scenario. In State v. Ronnie Thomas Baker, this court found extreme physical pain and protracted loss or substantial impairment of a function of a bodily member when the victim suffered a broken nose and a fractured orbital bone and was given pain medication during her eight-hour hospital stay. See No. M2018-02221-CCA-R3-CD, 2019 WL 4899761, at *4 (Tenn. Crim. App. Oct. 4, 2019), perm. app. denied (Feb. 20, 2020). Likewise, we conclude that the evidence was sufficient to establish serious bodily injury, and the Defendant is not entitled to relief on this basis.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE